UNITED STATES of America

v.

Irving H. POTTER et al.

No. 74 CR 537.

United States District Court,
N. D. Illinois, E. D.

Sept. 1, 1976.

Samuel Skinner, U.S. Atty., G. N. Gilkerson, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Michael G. Cheronis, Chicago, Ill., for defendant Wright.

Lawrence E. Morrissey, Chicago, Ill., for defendant Lindsey.

James D. Montgomery, Chicago, Ill., for defendants Potter, Cephas, Combs, Hobson, Moody, Neely, Nixon, Watson and Woods.

R. Eugene Pincham, Chicago, Ill., for all remaining defendants.

## MEMORANDUM OPINION

DECKER, District Judge.

Before the court is the question of whether these defendants have the standing to object to the introduction at trial of evidence which they contend to be the fruit of an illegal search.

### I. Posture of the Case

Defendants Irving H. Potter (Potter), Durand Cephas (Cephas), Harvey Nixon (Nixon), Larry Watson (Watson), Charles E. Wright (Wright), Jefferson Moody (Moody), Roy Combs, Jr. (Combs), Charles Neely (Neely), Juanita Woods (Woods), and Eddie Earl Hopson (Hopson) were indicted on July 24, 1974, for violating 18 U.S.C. § 1955 by conducting an illegal gambling business known as the Shake, Rattle & Roll Policy Wheel (Shake, Rattle & Roll). Defendant Lindsey pleaded guilty to the indictment, and the remaining defendants were convicted following a jury trial.

On appeal the defendants contended that the evidence upon which they were convicted was the fruit of an illegal search. That evidence was obtained as a result of the simultaneous execution of ten federal search warrants in Chicago, on June 22 and 23, 1973. The defendants argued that these searches were the "fruit of the poisonous tree" of an earlier search and seizure on April 12, 1972.

The April, 1972, search was carried out in execution of a search warrant describing in pertinent part the place to be searched as "the sole basement apartment located at 754 South Kilbourn, Chicago, Illinois . ." The Seventh Circuit ruled that insufficient facts had been presented in behalf of the warrant to "support the inference that the gambling paraphernalia and documents described in the search warrant could be found in the basement apartment." *U. S. v. Potter et al.,* Nos. 75–1366, 75–1389 (12/3/75) at p. 4. The court found that the search was also invalid since the warrant was expressly limited to the basement apartment at 754 South Kilbourn, whereas the objects seized "were found in an office, which was located in the same basement, but separated from the apartment by a common foyer or hallway." *Ibid.*

The Seventh Circuit therefore remanded this case "to determine whether evidence offered at the trial is tainted by the 1972 search." At p. 7. The remand required the resolution of two legal issues. (1) Do these defendants have legal standing to object to the 1972 search? (2) If they do have such standing, is the evidence introduced tainted as "the fruit of the poisonous tree"? The court determined to hold bifurcated hearings on these questions. Evidence was heard on May 3 and May 7, 1976, and the parties have submitted legal memoranda on the question of standing.

### II. The Evidence Before the Court

The premises located at 754 South Kilbourn Street were owned by Albert Overton.

Defendant Juanita Woods testified that she rented these premises from Overton's sister Jean Jones. Ms. Jones gave Juanita Woods the keys to the basement office. The rental payment was either $15 or $20 daily. This money was supplied by defendant Lindsey who brought the money each day in an envelope marked "rent" to Woods. It is contended that this money came from the proceeds of the Shake, Rattle & Roll operation. Woods would then "deliver" the rent to Ms. Jones by leaving the envelope on a table in the office. No written lease was ever signed and Overton was unaware of who used the basement office. Ms. Jones could not be located at the time of the hearing and thus did not testify. There is no evidence that Woods ever expressly indicated that she sought to use the office on behalf of Shake, Rattle & Roll. Furthermore, there is no evidence that the other defendants were consulted prior to the rental of the basement office.

The office was utilized by Woods and by Donald Potter (the son of defendant Irving Potter), as well as by two individuals named Maudela Wilson and Terrence Stewart. It was essentially the place where Woods and her assistants performed their clerical tasks. The policy writings, which represented betting slips in the policy operation, were brought to this location, as were the worksheets from the various collection areas, which summarized the collections and expenses of the local pick-up men. Ms. Woods testified that the office was rented "to use as a charting, counting and checking of hits of the policy operation." In sum, the office, which had been only recently rented by Woods before the raid, was primarily the latest place where Woods performed her tasks for the policy operation. While Ms. Woods testified that she had seen defendants Potter, Nixon and Hopson at 754 Kilbourn, there is no evidence as to what these individuals were doing when they were on the premises.

Sherman Noble, special FBI agent, whose affidavit underlay the search warrant, testified at the hearing. In March and April, 1972, Noble was engaged in an investigation of Shake, Rattle & Roll, and was of the belief that 754 Kilbourn had become the central office for that organization. Noble was of the belief that a search of the premises there would reveal the worksheets as to the overall operation of that policy wheel, and that he would find policy writings that had been dropped off there by defendant Lindsey.

Defendant Woods testified that all of her co-defendants were part of Shake, Rattle & Roll at the time of the April search. However, it is admitted by defendant Watson that he did not work with the policy operation in April, 1972. There is also some dispute as to whether the government was aware of the involvement of defendants Cephas, Combs, and Wright in Shake, Rattle & Roll at the time of the search. While the investigation was clearly aimed at the policy wheel as an organization, the government maintains that it did not direct the search with the specific intention of finding particular evidence that would inculpate Potter and Nixon.

At the time of the search only Donald Potter and Terrence Stewart, neither of whom are defendants, were present at the 754 South Kilbourn office.

## III. The Interest of the Defendants in the Premises Searched

The defendants argue that they had sufficient interest in the premises at 754 South Kilbourn to qualify as persons "aggrieved" by the unlawful April 12, 1972, search. Their basic argument is that the office had been rented by Shake, Rattle & Roll to serve as that organization's headquarters. The rent was paid with money from the policy wheel operations. The defendants therefore claim that each individual who was a policy wheel operative in April, 1972, had a proprietary interest as co-lessee in the premises.

The government implies that it feels that none of the defendants had any proprietary interest in the office. It challenges Ms. Jones' authority to act in behalf of her brother in leasing the basement, and argues that there was no written lease.

■ There can be little doubt that Juanita Woods must be considered the lessee of 754 South Kilbourn. The absence of a written lease cannot affect this conclusion. It is clear that Ms. Jones had apparent authority to rent the office, as is evidenced by her control of the keys. No evidence has been introduced to show that her brother disputed that authority. Ms. Jones gave defendant Woods the keys to the premises and accepted rental payments for their occupancy. Woods therefore does have standing as a lessee to contest the illegal search of the property she had rented.

■ The defendants argue that "by inference" the court must conclude that the premises had been rented by the entire organization. However, the amorphous facts relied upon by the defendants to substantiate this "inference" are insufficient to sustain this conclusion.

The evidence goes no further than to establish the existence of a day-to-day arrangement for defendant Woods to use these premises primarily for carrying out her own clerical duties for the policy wheel.

The fact that the rent money was paid with policy proceeds, while perhaps indicative that the organization acquiesced in her rental of the office, does not strengthen the proprietary status of the members of Shake, Rattle & Roll. In *U. S. v. McConnell,* 500 F.2d 347 (5th Cir. 1974), a rented vehicle was illegally searched. The vehicle had been rented by Byrd, the employee of McConnell, a wholesale marijuana distributor. The rent had been paid by McConnell, and the car was evidently used in the marijuana smuggling enterprise. *See U. S. v. Byrd,* 483 F.2d 1196 (5th Cir. 1973). McConnell asserted that his apprehension and conviction were the fruit of the poisonous tree because of the illegality of the search. The Fifth Circuit ruled that McConnell lacked standing to contest the search of the vehicle. The relationship of the other members of Shake, Rattle & Roll to the property rented by Woods is no greater than that of McConnell to the van

rented with his credit card for use in his illegal enterprise.

■ Nor is it significant that defendant Woods utilized 754 Kilbourn for tasks related to the policy operation. The fact that property used or rented by one defendant is utilized with the permission of that defendant by other defendants does not alter the nature of the proprietary relationships. *See U. S. v. Frick,* 490 F.2d 666 (5th Cir. 1973), where the court held that a partnership relationship between defendants did not give a co-defendant standing to contest the search of Frick's attache case, which was utilized in furtherance of a sham brokerage conspiracy. Similarly, in *U. S. v. Banks,* 465 F.2d 1235 (5th Cir. 1972), a printing press used in the counterfeiting scheme was discovered in an illegal search of a garage belonging to one of the defendants. Although defendant Adams profited from the use of the press in the conspiracy, and indeed had been present when it had been first picked up by its owner, defendant Banks, he was found to lack standing to object to the search. He neither owned the press, nor the premises searched. The factual posture of the instant case leads to no different conclusion. Indeed the result is the same as if Woods had chosen to use her own residence for her clerical tasks in behalf of the organization and had on occasion allowed her co-workers onto the premises.

The defendants argue in the alternative to their theory of co-lesseeship that they may assert a violation of their Fourth Amendment rights by the search as long as they had a right to use the premises.[1] Noting that Juanita Woods had evidently not objected to the presence of some of them on the premises, and correctly asserting that they could not be held to be trespassers when they entered, they claim standing to object to the search.

It is true that the law of standing with respect to Fourth Amendment claims has been expanded beyond the narrow property law definitions of "owner" and "lessee". In

1. Of course, this argument would not apply to defendant Watson who admitted that he did not work with Shake, Rattle & Roll at the time of the April search.

*Jones v. U. S.,* 362 U.S. 257, 266, 80 S.Ct. 725, 733, 4 L.Ed.2d 697 (1960), Justice Frankfurter wrote that "[d]istinctions such as those between 'lessee,' 'licensee,' 'invitee' and 'guest,' often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards." That case granted standing to an individual who was not the "lessee" of the illegally searched apartment, but merely a friend of the owner who permitted him to use the premises. Jones was present at the time of the search.

Subsequently the Court's decision in *Katz v. U. S.,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), shifted the emphasis from the assertion of a privacy right in the invaded place to the question of whether the defendant had a "reasonable expectation" of freedom from governmental intrusion in the area of the search. This was reiterated in *Mancusi v. De Forte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), where a defendant labor official who shared a non-private business office belonging to the union was found to have standing to contest the legality of a search of that office. Mancusi, like Jones, was present at the office at the time of the search, and had protested the legality of the intrusion.

■ *Jones, Katz* and *Mancusi, supra,* all clearly indicated that individuals with no greater possessory interest than that of a business invitee or guest could in certain circumstances assert their right of privacy against an illegal search on premises which they were occupying at the time of the search. But the scope of Fourth Amendment standing has remained limited to "personal rights which, like other constitutional rights, may not be vicariously asserted." *Alderman v. U. S.,* 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969).

The contention relied upon by the present defendants is far more expansive than principles expressed in these cases. In essence, it would apply the exclusionary rule against any incriminating evidence found in a search of premises where the defendant could not be shown to have been a trespasser. At its broadest, it would imply that a malefactor could enter upon property with the consent of its proprietor to deposit incriminating materials, and thenceforward be able to assert a sufficient interest in the premises to claim standing to object to any illegal search of the place of concealment.

■ The facts of the instant case reveal the breadth of the standing sought by the defendants. The policy organization was a large and loosely structured entity. It frequently changed the location of its offices, as is evidenced by the fact that 754 Kilbourn rented on a day-to-day basis. Members of the organization might well be unaware of the identities of all those currently affiliated with the policy wheel, and only a few individuals were aware of the drop-off center on Kilbourn. The concept of an interest in the premises searched sufficient to sustain standing is stretched beyond its limit when asserted by all the members of Shake, Rattle & Roll in this case. It certainly cannot be employed by those defendants (Cephas, Combs, Wright, Moody and Neely) who cannot be shown to have at least entered upon the premises at 754 Kilbourn. In *U. S. v. Hunt,* 505 F.2d 931, 941 (5th Cir. 1974), the court commented that "we have been unable to discern the slightest privacy interest that defendants could reasonably assert in objects which they have never seen and of whose particular existence they were unaware of until after the disputed search and seizure." Similarly, in this case, mere association with an organization which makes use of certain property belonging to one of its members should not entitle an individual to an expectation of privacy in a situs which he personally never used and of which he may well have been oblivious.

In any event, this contention is not available to the defendants since the Supreme Court's ruling in *Brown v. U. S.,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). The Court expressly ruled that

"there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory

interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense, possession of the seized evidence at the time of the contested search and seizure." 411 U.S. at 229, 93 S.Ct. at 1569.

■ Thus, absent an indictment for a possession offense, a defendant lacks standing to contest a search on a co-defendant's or any other person's property unless the defendant was himself legally on the premises at the time of the search. *U. S. v. Hunt, supra; U. S. v. Hearn,* 496 F.2d 236 (6th Cir. 1974); *U. S. v. Felix,* 474 F.2d 610 (9th Cir. 1973); *U. S. v. Banks, supra.*

■ The only individuals present at 754 Kilbourn at the time of the April 12, 1972, search are not defendants in this case. Thus, of the present defendants, only Juanita Woods, the lessee of the premises, has a close enough relationship to the situs of the search to claim that her reasonable expectations of privacy were violated. The others lack standing.

■ Nor can the defendants derive standing to object to the search because their property was seized by the government agents. In *United States v. Lisk,* 522 F.2d 228 (7th Cir. 1975) (Stevens, J.), the Seventh Circuit dealt with the search and seizure of defendant Lisk's property (a bomb) during an illegal search of a car belonging to another. The court held that "defendant has standing to object to the seizure, but no standing to object to the search. Having put the search to one side, he has not demonstrated that the evidence should be suppressed on the grounds that *his* Fourth Amendment rights were violated by the seizure," at 231.

### IV. Standing as the Objects of the Search

■ The defendants argue that they have standing to object to the search, regardless of whether they had any interest in the office at 754 Kilbourn, because the search was "directed" at them. As noted *supra,* the government contends that the search was directed solely at defendant

Woods and non-defendants Wilson, Donald Potter and Terry Stewart. The government maintains that the FBI did not seek any evidence against Irving Potter and Nixon although it was aware that they belonged to Shake, Rattle & Roll. The court finds that the evidence makes it clear that the search was directed against the entire policy wheel organization, and cannot conclude that it was directed merely against a few operatives.

The theory that a defendant may raise a Fourth Amendment claim because he was the object of an illegal search has emerged from the language of several Supreme Court cases. In *U. S. v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), the defendant was found to have standing to object to a warrantless narcotics search of his aunts' hotel room; Jeffers had been given a key to the room and permission to use it whenever he felt fit. In analyzing *Jeffers,* then Judge Stevens commented that there were three possible theories upon which Jeffers' standing could have been based. (1) He was a regular invitee, although he was not present at the time of the search. (2) The search was "directed at him" because the police were looking for evidence that would incriminate him. (3) He had an interest in the seized property itself. Judge Stevens conceded that the language of *Jeffers* emphasizes theory (2), focusing on the fact that "the police entered the hotel room 'for the sole purpose of seizing respondent's narcotics.'" 522 F.2d at 232, citing *Jeffers.* Although Judge Stevens added that "[i]n later cases the Supreme Court has cited *Jeffers* as though it was decided on the first theory, that the defendant's interest in the searched hotel room rather than in the seized property allowed him to challenge the search," 522 F.2d at 232, citing in footnotes *Mancusi, supra; Hoffa v. U. S.,* 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); and *Lanza v. New York,* 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), certain language in *Jones v. U. S., supra,* admittedly has been often used in behalf of the "directed at" theory of standing. In particular, the defendants refer to the controversial passage

found at 362 U.S. 261, 80 S.Ct. at 731, where Justice Frankfurter wrote that

> "[i]n order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, *one against whom the search was directed,* as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." (Emphasis added.)

Over the years considerable controversy has developed as to whether the words "one against whom the search was directed" were meant to delineate a separate basis for standing. Judge Stevens did not have to reach this issue in the disposing of the motion to reconsider *Lisk* because the defendant did not offer to prove that the police were seeking his property when they illegally searched a car belonging to his friend Hunt. But in footnote 4 at 522 F.2d 233, Judge Stevens did note that this could be implied from the language in *Jeffers* and *Jones,* and added that the concurring opinion of Judge Swygert in *Lisk* was of the belief that there was such an independent basis for standing. A fairly recent opinion of the Seventh Circuit, written by Judge Hoffman,[2] and concurred in by Judge Tone and Judge Bauer, states that:

> "The defendant's possessions were, however, the object of the search, and this would appear to give him standing under *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). Compare *United States v. Lisk,* 522 F.2d 228 (7th Cir. 1975). Although the Court said in *Alderman v. United States,* 394 U.S. 165, 171–172, 89 S.Ct. 961, 965–966, 22 L.Ed.2d 176, 185–186 (1969), that only 'those whose rights were violated by the search itself' may urge suppression of the fruits of the search, *Jeffers* has not been overruled. Whether it has been eroded by *Alderman,* is for the Supreme Court to say. Accordingly, we assume the defendant here has standing, since his posses-

sions were the target of the search." *U. S. v. Alewelt,* 532 F.2d 1165, at 1167 (7th Cir. 1976).

But this language in *Alewelt* is pure dictum since the court found that the defendant did not have any expectation of privacy in a coat placed in a coatrack in a public building, and thus was not entitled to raise a Fourth Amendment objection to the search.

On the other hand, there is strong support for the contention that being "the object of a search" does not establish Fourth Amendment standing. Perhaps most convincing is the total exclusion of this ground from the reformulation of standing found in *Brown v. U. S.,* 411 U.S. at 229, 93 S.Ct. 1565. Judge Stevens was evidently impressed by "respectable authority for a reading of the phrase 'one against whom the search was directed' as merely another way of describing 'a victim of a search or seizure,' rather than as an additional category of persons having standing to make the Fourth Amendment objection." *Mabra v. Gray,* 518 F.2d 512, 514 (7th Cir. 1975). This reading would transform the disputed phrase into an appositive, merely another formulation to describe an individual whose reasonable expectations of privacy had been violated. Judge Stevens in particular referred to the opinion in *Sumrall v. U. S.,* 382 F.2d 651, 654–55 (10th Cir. 1967), *cert. den.* 389 U.S. 1055, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968), and to W. White & R. Greenspan, "Standing to Object to Search and Seizure," 118 U.Pa.L.Rev. 333, 346–48 & n. 81 (1970). Judge Stevens reiterated his interest in this interpretation in footnote 4 to the opinion on the motion to reconsider *Lisk, supra.*

But while *Mabra, supra,* like *Lisk,* fails to reach the issue of whether being the object of a search creates an independent basis for standing, it does determine that this theory cannot be of any benefit to those defendants in this case found to lack sufficient interest in the premises at 754 South Kilbourn.[3] The appellant in *Mabra* sought to

---

2. Senior District Judge sitting by designation.

3. Although *Jeffers* has not been repudiated by the Supreme Court, and the Seventh Circuit did not expressly consider the concept of an inde-

pendent basis for standing for the object of a search, *Alderman, Brown* and *Mabra* all cast considerable doubt as to the continuing vitality of this theory of standing.

assert standing against the introduction of incriminating evidence obtained through an illegal search of his wife. He argued that he had standing because the search of his wife was intended to uncover evidence linking him with an armed robbery. Judge Stevens did not dispute that the search may have been directed against Mr. Mabra. But he noted that it was also directed against Mrs. Mabra inasmuch as the police hoped to find evidence that would also incriminate her in the robbery and the getaway. Judge Stevens did not rule on the larger question of "directed-at" based standing because the illegal search was also directed at the individual whose privacy rights had been violated. Citing *Lisk,* Judge Stevens concluded that

> "Neither the custodial search of Mrs. Mabra, nor the seizure from her person of the proceeds of the armed robbery violated Mabra's Fourth Amendment rights. . . . Accordingly, as a matter of federal law, he had no right to object to the admissibility of that evidence." 518 F.2d at 514.

*Mabra* is dispositive of the instant case. Here, too, we find an illegal search with the objective of finding incriminating evidence linking various individuals to a common offense. The search violated the privacy and possessory rights of one of the individuals at whom it was directed, Juanita Woods. Defendant Woods, like Mrs. Mabra, therefore has standing to object to the search. The other defendants, like Mr. Mabra, do not have any interest in the premises or person that was violated, and lack standing to raise a Fourth Amendment objection to the April 12, 1972, search.