**UNITED STATES of America**

v.

**Roger S. BASKES et al.**

**No. 76 CR 585.**

United States District Court, N. D. Illinois, E. D.

March 23, 1977.

On Pretrial Motions May 18, 1977.

See also, D.C., 433 F.Supp. 812.

Sam L. Strother, Atty., Joseph W. Salus, II, Trial Atty., Dept. of Justice, Tax Div., Washington, D.C., M. J. Higgins, Asst. U.S. Atty., Chicago, Ill., for the U. S.

James P. Chapman, George J. Cotsirilos, Chicago, Ill., for defendant Kanter.

Harvey M. Silets, Harris, Burman & Silets, Chicago, Ill., for defendant Baskes.

Bruce I. Hochman, Hochman, Salkin & DeRoy, Beverly Hills, Cal., for defendant Zell.

Marvin J. Garbis, Garbis & Schwait, Baltimore, Md., for defendant Hammerman.

## MEMORANDUM OPINION

DECKER, District Judge.

This criminal prosecution compels the court to confront a difficult dilemma. It raises the issue of defining the limits within which the government may employ morally dubious tactics to obtain evidence without undermining the validity of the indictments thereby obtained.

The instant indictment was brought in the District of Nevada on March 4, 1976, and subsequently transferred to this court. The defendants are three attorneys in a Chicago law firm and a fourth attorney, also admitted to practice in Illinois. They are charged with a violation of 18 U.S.C. § 371, conspiracy to defraud the United States. The indictment charges that the defendants devised a sophisticated scheme

to enable their clients to file fraudulent tax returns. The allegations of the indictment assert that they structured certain real estate sales "to disguise and falsify the true tax consequences", falsely attributed the purchase price of real estate to another purchase, and devised, promoted, and caused "a series of manipulations through the use of a corporate entity, corporate stock, foreign[1] and domestic trusts, partnerships, backdated documents, and ostensible transfers of ownership, so as to disguise and conceal from the Internal Revenue Service the true nature of the sale of Arlington Towers and Arlington Plaza."

The defendants assert that much of the government's evidence, and perhaps even the indictment itself, was derived from allegedly illegal investigative activity. It is claimed that these defendants were among the principal targets of an extensive IRS investigation, best known as Project Haven, although it was also called Project Decode and Operate Tradewinds.

The methods allegedly employed by Project Haven have obtained considerable notoriety in the national press, and have been the subject of an investigation in 1975 by a subcommittee of the Committee on Government Operations of the United States House of Representatives, chaired by Congressman Benjamin S. Rosenthal.

The defendants maintain that the agents and informants employed by Project Haven engaged in a series of illegal activities in their quest for evidence, including theft, the warrantless seizure of private property and the unauthorized copying of documents, prostitution, the subornation of foreign officials, and the violation of foreign banking laws.

The defendants have moved to suppress evidence or to dismiss the indictment, and seek a hearing in which to prove their charges of illegal government activity. They have attempted to include with their motions and supporting briefs a substantial quantity of documentary evidence. Some of these materials, such as copies of newspaper and magazine articles, are clearly inadmissible. Other items, such as copies of internal memoranda of the IRS, of letters from IRS Commissioner Alexander, and of testimony before the Rosenthal subcommittee, may be admissible if properly authenticated.

The most publicized of the alleged incidents may be labeled "the briefcase affair." This event may be summarized as follows:[2] The agents investigating these defendants became interested in the alleged use of Castle Bank and Trust, a Bahamian financial institution, as part of defendants' purported tax-avoidance schemes. Norman Casper was employed by an IRS investigator as an informant. He managed to ingratiate himself with the managing director of Castle Bank, Michael Wolstencroft, and learned that Wolstencroft was flying to Chicago, via Miami, with a list of bank clients to be taken to the defendants' law firm. Casper arranged an assignation for Wolstencroft with a certain Sybil Kennedy. Ms. Kennedy succeeded in getting Wolstencroft to leave his briefcase, containing the desired documents, in her apartment. She then detained Wolstencroft outside the apartment during a dinner engagement, and engaged in sexual intercourse for compensation. By the time Wolstencroft returned to her apartment, IRS agents had taken the briefcase out of the apartment,

---

1. The reference to the use of foreign trusts appears through paragraph 7G of the indictment to concern a $700,000 transfer to a trust administered by the Castle Trust Company, Limited, Nassau, Bahamas. The government's investigation which is challenged by this motion allegedly focused upon the defendant's relationship with this trust and Castle Bank and Trust Company.

2. This summary is based upon the allegations made by the defendants in their motions to suppress and in their supporting briefs. It also, for the purposes of narration, assumes the admissibility of the testimony of Norman Casper before the Rosenthal subcommittee, and of a letter sent by Commissioner Alexander, as well as an internal IRS memorandum. Copies of these documents have been appended to defendants' motions, accompanied by an affidavit from their counsel that these are true and correct copies of the originals.

forced its lock, and photographed the contents.

Relying on Casper's testimony, the defendants also assert that shortly thereafter, Kennedy visited Wolstencroft at the Castle Bank, and removed, by concealing in her purse, a rolodex file containing the names and addresses of Castle Bank clients. This was taken to the United States and was turned over to the IRS investigators.

At no point in this litigation has the government denied the allegations about the briefcase affair, the theft of the rolodex, or the accusations of bribery of Bahamian officials. Assuming that the letters and testimony submitted by the defendants can be verified, it appears that there have been admissions of illegal conduct. In a letter to Congressman Mezvinsky, Commissioner Alexander stated, "I cannot give you negative assurances for the past that all improper activities of the IRS have been publicly revealed" and added that the IRS agents' activities "involved at the very least a violation of Bahamian law". In his testimony before the Rosenthal subcommittee, Casper appears to have conceded that his investigations violated the Bahamian Banking Act of 1965.

If admissible, an internal IRS intelligence memorandum indicates that these activities may have been closely related to the development of the instant indictment. One passage reads as follows:

"As a result of information developed by Project HAVEN and its [deletion] Department of Justice Attorneys, three members of the [deletion] law firm, [deletion], are presently under joint investigation by the Reno District for patently fraudulent tax planning in connection with their purchase of [deletion]. Through the efforts of HAVEN and its attorneys, significant testimony and documentary evidence has been obtained from members of the [deletion] relative to criminal violations committed by [deletion] and his associates."

*The Standing of the Defendants to Object to the Evidence*

As noted the government has not challenged the veracity of the allegations of investigative misconduct, nor meaningfully disputed the value of its fruits for this prosecution. Rather, the government stresses that these defendants lack legal standing to demand the exclusion of any evidence tainted by illegality.

This poses a complicated constitutional question. Normally the "exclusionary rule" is successfully asserted by defendants who

"(a) were . . . on the premises at the time of the contested search and seizure; (b) alleged . . . proprietary or possessory interest in the premises; and (c) were . . . charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." *Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973).[3]

These defendants cannot seriously claim to fit within any of these categories.

The defendants can only assert standing to claim the benefit of the exclusionary rule on the basis of a much-discussed passage in Justice Frankfurter's opinion in *Jones v. U. S.,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960). There it was said:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, *one against whom the search was directed,* as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." (Emphasis added.)

As this court noted in its opinion in *U. S. v. Potter,* 419 F.Supp. 1151 (N.D.Ill.1976), there has been considerable controversy as to whether this language creates a separate basis for standing for the objects of an illegal search.

**3.** The formulation in *Brown* is actually posed in the negative and lists the grounds of standing by noting the claims not available to the defendant.

This passage was cited with approval by Justice White for the majority in *Alderman v. U. S.*, 394 U.S. 165, 173, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). However the majority opinion stresses that the exclusionary rule is founded upon Fourth Amendment rights, and adds that these are "personal rights which, like some other constitutional rights, may not be vicariously asserted," at 174, 89 S.Ct. at 966.

The *Alderman* opinion went on to add that

"No rights of the victim of an illegal search are at stake when the evidence is offered against some other party . .

". . . we think there is a substantial difference for constitutional purposes between preventing the incrimination of a defendant through the very evidence illegally seized from him and suppressing evidence on the motion of a party who cannot claim this predicate for exclusion." At 174, 89 S.Ct. at 967.

The partial dissent of Justice Fortas in *Alderman* strongly defends the concept that "one against whom the search was directed" is a "victim of an invasion of privacy" entitled to assert the exclusionary rule, at 207–209, 89 S.Ct. at 985. However, it is possible to view this argument as opposition to a *sub silentio* modification of *Jones*.

Although, "one against whom the search was directed" is omitted from the formulation of standing found in *Brown, supra*, it has never been expressly rejected.[4]

In the Seventh Circuit the concurring opinion of Judge Swygert in *United States v. Lisk*, 522 F.2d 228, 231 (7th Cir. 1975), indicates a belief that *Jones* permitted individuals who were the objects of a search to assert the exclusionary rule on that basis.

Similar language, upholding this separate ground for standing, may be found in *U. S. v. Alewelt*, 532 F.2d 1165, at 1167 (7th Cir. 1976). While *Alewelt* raises the possibility that *Alderman* had "eroded" this basis of standing, it declined to so rule without an explicit declaration to this effect from the Supreme Court. This passage in *Alewelt*, however, may be viewed as dictum in light of the ultimate disposition of that case.

On the other hand, while Justice Stevens was still on the Seventh Circuit, he indicated his interest in a theory that the disputed language in *Jones* did not create an additional basis for standing. He considered it quite possible that "one against whom the search was directed" was merely an appositive, an alternative formulation to describe an individual whose reasonable expectations of privacy had been violated. *Mabra v. Gray*, 518 F.2d 512, 514 (7th Cir. 1975).[5]

In ruling on the motion to reconsider *Lisk, supra*, Justice Stevens again noted the controversy, contrasting Judge Swygert's position with the analysis discussed in *Mabra*. 522 F.2d at 233, n. 4.

A careful reading of the case law cited by the parties does not truly clarify the matter. In those cases where the defendants were found to be the objects of the search, and where standing was granted, there also appears to be a more traditional alternative basis for standing. In *U. S. v. Kelly*, 529 F.2d 1365 (8th Cir. 1976); *U. S. v. Mapp*, 476 F.2d 67 (2d Cir. 1973); *U. S. v. Cobb*, 432 F.2d 716 (4th Cir. 1970); and *U. S. v. Rosenberg*, 416 F.2d 680 (7th Cir. 1969), the defendants all appeared to have some possessory interest in either the premises or in

4. It does not appear that this ground for standing was raised in *Brown*. However, the facts of the case make it appear that Brown could well have claimed to have been the object of the search. The illegal search was ordered after the defendants had been arrested, and had stated that they had "sold" the stolen goods to Knuckles. The search of Knuckles' store clearly was directed at procuring evidence to be used against Brown and his codefendant. *But see, Mabra v. Gray*, 518 F.2d 512 (7th Cir. 1975), for an alternative ground under which Brown would be barred from challenging the violation of Knuckles' right of privacy.

5. Justice Stevens in particular referred to the opinion in *Sumrall v. U. S.*, 382 F.2d 651, 654–55 (10th Cir. 1967), *cert. den.* 389 U.S. 1055, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968), and to W. White & R. Greenspan, "Standing to Object to Search and Seizure", 118 U.Pa.L.Rev. 333, 346–48 & n. 81 (1970).

the property seized. *Kelly* also appears to be in part based upon a variant of "automatic standing" created by the government's contradictory assertions that the defendant had sufficient dominion over the seized books to have violated the statute, and that he lacked enough dominion over the books to claim a possessory interest.

By contrast, the *Jones*-theory of standing does not appear to have been raised in cases such as *U. S. v. Parker,* 530 F.2d 208 (8th Cir. 1976); *U. S. v. Boston,* 510 F.2d 35 (9th Cir. 1974); and *U. S. v. Foster,* 506 F.2d 444 (5th Cir. 1975), where standing was denied.

In *Mabra v. Gray, supra,* the Seventh Circuit was able to avoid ruling on the validity of such an assertion of standing by holding that a defendant who is "the object of a search" cannot assert the violation of another's privacy rights where that other individual was *also* "one against whom the search was directed." [6]

The instant prosecution therefore poses in crystalline form the fundamental question of whether one who is the sole object of an illegal search may have standing to assert the exclusionary rule in the absence of any other basis for standing.

The defendants cannot claim any proprietary interest in either Ms. Kennedy's apartment, the bank premises, or in Wolstencroft's briefcase, or Castle Bank's documents and rolodex. They were not on the premises of either the Bank or at the apartment at the time of the incidents, and they are not charged with any possessory-type offense.

Furthermore, if it can be demonstrated that these lawyers were the principal individuals at whom the search was directed, the government cannot rely upon *Mabra,*

since it is apparent that the government never had any intention to prosecute either Wolstencroft, or Castle Bank, whose privacy rights were violated.

The constitutional principles involved in such a situation have not been clarified, and the lower courts have shown extreme reluctance to venture a guess as to how the Supreme Court would decide such a question.[7] In such a situation it behooves the court to recall the admonition that "[i]t is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. U. S.,* 196 U.S. 283, 295, 25 S.Ct. 243, 245, 49 L.Ed. 482 (1905), cited by Justice Brandeis in his concurrence to *Ashwander v. Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936). This maxim is applicable to the instant case, where the defendants have alternatively based their motion upon the supervisory powers of the court.

### Supervisory Powers of the Court

The defendants argue that the facts of the government's investigatory efforts to develop this prosecution compel the court to exercise what they term the "supervisory powers of the court".

They argue that the federal courts have supervisory powers over federal prosecutions which may be invoked without reaching any constitutionally based determination. This claim is asserted to be based upon *McNabb v. U. S.,* 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943), where the Supreme Court through Justice Frankfurter noted that "[j]udicial supervision of the administration of criminal justice in the

---

**6.** This creates a type of "lightning rod" theory of standing. If two individuals are the objects of an illegal search, the one whose privacy rights are violated absorbs the entire effect of the exclusionary rule. *See U. S. v. Potter, supra.*

**7.** For example, Judge Kaufman discussed at length but refrained from relying upon the *Jones* language in deciding *U. S. v. Mapp,* 476 F.2d 67 (2d Cir. 1973). After juxtaposing *Jones* against the opinions of Justice White and Fortas in *Alderman,* Judge Kaufman said the

"'target of the search' doctrine must still be regarded as an open question." 476 F.2d 67, 71. In n. 8 on the same page Justice Frankfurter's language in *Jones* was alternatively "read as a suggestion, not a conclusion".

Similar caution can be found in the passage in *U. S. v. Alewelt,* cited *supra.* The opinion in *Mabra v. Gray, supra,* appears to express relief at the absence of any need to "squarely hold" on the *Jones* language.

federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." The defendants state that since *McNabb* this supervisory power has been utilized to suppress evidence, and even to dismiss entire prosecutions where governmental bad faith conduct caused "the waters of justice [to be] polluted", *U. S. v. Banks,* 383 F.Supp. 389, 397 (D.S.D.1974); *see also U. S. v. Valencia,* 541 F.2d 618 (6th Cir. 1976).[8]

The defendants point out that articulation of the ethical basis of the *McNabb* supervisory powers concept can be traced to the famous dissents of Justice Holmes and Brandeis in *Olmstead v. U. S.,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). The conclusion of the Brandeis dissent emphasizes that:

> "Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

Justice Brandeis' plea was reinforced by Justice Holmes' argument that

"apart from the Constitution, the Government ought not to use evidence obtained and only obtainable by a criminal act . . . It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the Government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained. . . . We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part." 277 U.S. at 469–70, 48 S.Ct. at 575.

It is maintained that these eloquent passages cannot be easily dismissed as mere dissenting rhetoric. They are referred to and cited by the Supreme Court in *Elkins v. U. S.,* 364 U.S. 206, 222–23, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960), as expressing a "basic principle [which] was accepted by the Court in *McNabb v. United States.*"

Defendants' briefs reveal that *McNabb* is itself replete with statements of similar impact and direction. The Supreme Court was apparently concerned that toleration of unprincipled evidence-gathering would "[make] the courts themselves accomplices in willful disobedience of law." 318 U.S. at 345, 63 S.Ct. at 615. The conclusion of *McNabb* argues that

"a decent regard for the duty of courts as agencies of justice and custodians of liberty forbids that men should be convicted upon evidence secured under the circumstances revealed here . . . The history of liberty has largely been the history of observance of procedural safeguards. And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law." 318 U.S. at 347, 63 S.Ct. at 616.

---

**8.** *See also U. S. v. McCord,* 166 U.S.App.D.C. 1, 509 F.2d 334, 349 (1974), where the court stated "we have no doubt that McCord's most general assertion of principle is grounded in respectable authority: *i. e.* serious prosecutorial misconduct may so pollute a criminal prosecution as to require dismissal of the indictment or a new trial, without regard to prejudice to the accused."

In *U. S. v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), the Court stated that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction, cf. *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)."

A reading of defendants' cases, however, also demonstrates that "supervisory powers" remain a harsh ultimate sanction, and are more often referred to than invoked. They are apparently kept in reserve for "conduct that shocks the conscience", *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Even where these powers are seemingly acknowledged, courts often decline to exercise them. *U. S. v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *U. S. v. McCord,* 166 U.S.App.D.C. 1, 509 F.2d 334, 348–51 (1974).

Of course the seriousness of the charges contained in the indictment would naturally make this court hesitant to provide these defendants with a means to avoid trial, or to exclude possibly significant and otherwise admissible evidence. Defendants' cases do point out, however, that this is an inevitable part of the dilemma posed by "supervisory powers." Thus in *Valencia* the district court felt that the defendants were "beneath contempt" but could not permit "the law in its majesty . . . to be equally slimy", *Valencia, supra,* at 621.

■ Furthermore, the drastic nature of the remedy provided by the exercise of its supervisory powers renders it essential that they not be applied indiscriminately to remedy every prosecutorial misstep. Even if it should be shown that the court possesses such inherently discretionary powers, they should not reflect the personal predilictions of each judge. They certainly should not be invoked by technical illegalities or inadvertent violations, or perhaps even where the government aided but did not itself instigate or provide essential assistance to illegal behavior.[9] These powers should not permit the criminal "to go free because the constable blundered." *People v. Defore,* 242 N.Y. 13, 150 N.E. 585, 587 (1926), cited in *U. S. v. McDaniels,* 355 F.Supp. 1082 (E.D.La.1973).

The defendants however argue that this case raises the more severe spectre of government agents willfully and intentionally committing crimes and felonies to further a particular prosecution. They cite *U. S. v. Archer,* 486 F.2d 670, 676–77 (2d Cir. 1973), where Judge Friendly wrote that

"[i]t would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction."

The defendants have alleged that the government agents in this case did knowingly authorize and commit theft, break-ins of locked personal property, bribery, prostitution, and violations of the laws of a foreign sovereignty. Their allegations do attempt to place this case within the ambit of Judge Friendly's proscription, and attempt to depict "conduct that shocks the conscience."

Defendants point to a transcript of testimony received by the Rosenthal subcommittee which they argue reveals that the government knowingly and deliberately condoned illegal investigative methods. In particular, they cite the moment when Congressman Mezvinsky asked IRS Agent Jaffee whether he had a memo from William Hyatt, the Department of Justice attorney who presented the instant case to the Reno grand jury,

"stating the activity [the briefcase affair] would not be viewed as illegal, or that it should not restrict your future activity."

Agent Jaffee replied that

"the context he put it was that none of the individuals on the list would have any standing to object legally in court to the use of our information."

It is contended that this response reveals a willing condonation of illegality so long as it would not jeopardize any prosecutions. The defendants' allegation seek to depict a

---

9. This would include situations where law enforcement officers made an honest mistake as to the scope of a warrant, or erroneously assumed in good faith that they had probable cause for a search.

situation in which the technical rules of standing might not be sufficient to deter deliberate official illegal activities. Their motion implies that only supervisory judicial powers could protect the privacy rights of third parties where law enforcement authorities would not be affected by any application of the exclusionary rule.

The defendants' position is founded in this respect upon Justice Frankfurter's statement in *McNabb, supra,* 318 U.S. at 343, 63 S.Ct. at 614, that

> "Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic."

Just as Justice Brandeis warned in *Olmstead* that government lawbreaking invites the same conduct from every citizen, the defendants would argue that the contagion of crime may also be rapidly spread from government agent to government agent.

The defendants have therefore raised significant factual issues regarding the nature and effect of the government's investigative efforts in this case. Their arguments concerning the appropriateness of the exercise of judicial supervisory powers also raises an important issue of law.

In response, the government's briefs have been incomplete. The prosecution has chosen to only address the issue of legal standing under the exclusionary rule, and has totally ignored the defendants' arguments that the facts of this case compel the use of the supervisory powers of the court.

It has neither responded to the allegations of illegal conduct, nor has it supported in any way its assertion that the "prosecution of this case is based on the testimony of witnesses and documentary evidence completely independent of Project Haven, and no information was received or obtained from Project Haven sources."

■ Therefore, prior to ruling on the instant motion to suppress evidence or dismiss the indictment, the government will be required to brief the question of judicial supervisory powers.

The government is further ordered to supply a statement verifying its contention that this case does not rest upon any evidence secured by illegal conduct on its part. While this statement need not reveal the trial strategy of the prosecution nor its anticipated evidence, it should provide sufficient detail to enable the court to determine the appropriateness of investigating the need to apply any available supervisory powers at this stage.

## ON PRETRIAL MOTIONS

Pending before the court in this case are defendants' motion to suppress, defendants' motion to dismiss the indictment, and the motion of defendant Kanter for a separate trial. All of these motions have been extensively briefed, and this court has previously entered on March 23, 1977, a memorandum opinion dealing with issues arising from the instant motion to suppress.

*I. The Motion to Suppress*

A. This motion is based upon the assertions of the defendant that this prosecution is derived from or inextricably related to certain allegedly wilful, illegal investigative activities of government agents. These allegations are described in some detail in this court's opinion of March 23, 1977, at pp. 801–802. Among these activities is the incident known as the "briefcase affair", which was the subject of a lengthy hearing before Judge Manos in *U. S. v. Payner,* 434 F.Supp. 113 (N.D.Ohio 1977).

B. The March 23rd memorandum opinion discussed at length the constitutional question of the standing of these defendants to raise a Fourth Amendment objection to the "briefcase affair" and the other alleged governmental lawbreaking. Essentially, the issue is whether individuals against whom an illegal search is directed may assert the Fourth Amendment where their own privacy rights were not violated (i. e. they had no proprietary or possessory interest in the premises or the seized ob-

jects, and were not on the premises at the time of the search and seizure), where they were not charged with a possessory offense, and where the individual whose Fourth Amendment rights were violated was not charged with any offense as a result of the search.

C. It is not necessary to repeat the analysis of the leading cases on this question made at pp. 802–804 of the March 23rd opinion. Suffice it to say that cases subsequent to *Jones v. U. S.,* 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), most importantly *Brown v. U. S.,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), and *Alderman v. U. S.,* 394 U.S. 165, 173, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), have indicated that the Supreme Court never intended to create an independent basis of Fourth Amendment standing for persons "against whom the search was directed". The Seventh Circuit has never ruled on this question, but various cases, particularly *U. S. v. Alewelt,* 532 F.2d 1165 (7th Cir. 1976), and the opinions of Judge (now Justice) Stevens in *Mabra v. Gray,* 518 F.2d 512 (7th Cir. 1975), and *U. S. v. Lisk,* 522 F.2d 228 (7th Cir. 1975), have reflected skepticism that merely being the "object of a search" will afford standing to object to its illegality.

█ While the court hoped to be able to avoid reaching this question, it now appears necessary to do so. The court therefore holds that these defendants lack standing under the Fourth Amendment to assert the illegality of the "briefcase affair". A similar conclusion was reached by Judge Manos in *U. S. v. Payner, supra.*

D. Although the defendants lack Fourth Amendment standing, they have additionally argued that this court should suppress the evidence in this case by the exercise of its supervisory powers.

This court has asked for briefs on the scope of its judicial supervisory powers, and has done some research of its own on this matter (cf. pp. 804–807 of the March 23rd opinion). Additionally, Judge Manos considered the question in the *Payner* opinion and reached the conclusion that the supervisory powers of the federal courts

may be invoked to exclude evidence which has been

> "obtained by Governmental conduct which is either purposefully illegal or motivated by an intentional bad faith hostility to a constitutional right."

In doing so Judge Manos rejected the contention also raised by the prosecution in this case that supervisory powers may be imposed only in cases of "coercion, violence or brutality".

E. The imposition of these supervisory powers is, of course, a matter of judicial discretion. As indicated in the March 23rd opinion (see cases cited at p. 804), the supervisory powers may be employed to bar evidence which is the fruit of wilfully illegal or egregious anti-constitutional governmental conduct, or more commonly to dismiss an entire indictment.

A ruling on the appropriateness of applying these supervisory powers requires consideration both of the nature and extent of the governmental abuse, and of the relationship of this illegality to the indictment at bar.

While the hearing in the *Payner* case dealt with the "briefcase affair" in great detail, it did not consider other allegations of governmental illegality made by these defendants, most importantly charges of subornation of foreign officials.

The court has received from the parties various briefs and affidavits and other exhibits attempting to delineate the relationship of the "briefcase affair" to the instant indictment. These materials have not proven sufficient to enable the court to reach a well-informed decision on the nexus between the incident and the indictment.

Furthermore, it is apparent that such a decision cannot be properly made before the full nature of the prosecution's evidence becomes known. Whether the evidence to be introduced at trial and the indictment which it is to support have been tainted by activities manifesting a deliberate flaunting of the Constitution cannot be determined without knowledge of the actual evidence that the government seeks to introduce, and

the theories upon which this prosecution is based.

It is clear that any pretrial hearing on the alleged "taint" afflicting the government's case would entail a virtually complete preview of that case. This would not only entail a monumental duplication of effort, and an egregious wastage of judicial resources, but would also *per force* afford the defendants with insights into the prosecution's case not afforded by any principle of discovery.[1]

While the court is cognizant that the defendants would prefer to have the validity of the instant indictment and of the government's evidence adjudicated prior to trial, the above considerations militate against any pre-screening of the case.

■ Accordingly, the court will consider the appropriateness of the invocation of its supervisory powers only in the context of the actual trial. The government will be permitted to introduce its evidence and make its case to the jury. If its case is sufficient to so justify, the jury will be allowed to proceed to reach a verdict.

In the event that a verdict is rendered against the defendants, the court will then entertain a full hearing on the matters relating to the propriety of exercising its supervisory powers to dismiss this prosecution. Such a hearing would consider any disputed facts pertaining to governmental conduct which would justify the exercise of these powers, and would explore the nexus between any conduct of this sort and the case presented by the prosecution.

Accordingly, the court holds that the defendants lack standing to move for the suppression of the evidence in this case on the basis of the Fourth Amendment. It further defers ruling on the propriety of exercising its judicial supervisory powers in this case until this question may be considered in the context of a hearing at trial.

## II. Defendant Kanter's Motion for a Severance

Defendant Burton W. Kanter has renewed his motion for a separate trial. This motion asserts that the testimony of codefendant Samuel Zell would exculpate Kanter with respect to the only evidence which the government could introduce connecting him to the conspiracy alleged in the indictment. This is essentially the same argument made to Judge McGarr, and rejected in a memorandum opinion dated September 27, 1976.

In renewing this motion, Kanter now asserts that recent discovery and certain alleged admissions of the government indicate that the only nexus of Kanter to this prosecution is limited to Kanter's role at a meeting in Reno, Nevada, on February 17, 1970. Kanter further adds that the statements of the other participants at that meeting indicate that the government will be unable to present witnesses who will be able to testify that Kanter acted at that meeting in the manner alleged in overt act No. 7A of the indictment. He asserts that Zell's testimony would "strike at the heart of the only allegation the government can make against [him]" and provide "dramatic" exculpation.

The government denies that its case is limited to Kanter's participation in the February 17th meeting and maintains that Zell's testimony would only "contradict certain details" of its case. It therefore denies that this case falls within the narrow grounds enunciated in *U. S. v. Abraham*, 541 F.2d 1234 (7th Cir. 1976), that severance is required where a co-defendant's evidence would have refuted "the only evidence upon which the conviction is based."

In ruling upon Kanter's first motion for severance, Judge McGarr noted that this is a decision within the trial court's discretion, F.R.Cr.P. 14, *Opper v. U. S.*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954). Judge McGarr noted the difficulty of applying the *Abraham* test "without the advantage of post-trial hindsight". He stressed the im-

---

1. The court notes that these defendants have made extensive efforts to obtain more discovery materials than the prosecution is willing to divulge, including various motions to compel discovery and the filing of a plethora of actions under the Freedom of Information Act.

possibility of evaluating the importance of Zell's potential testimony without knowledge of the nature of the government's case.

As with the motion to suppress, it appears that this motion can be decided with certainty at the present time only at the expense of compelling the government to expose its entire case (its witness list, litigational theory and trial strategy) prior to trial. Thus, even if Kanter were not to prevail on this motion, he would benefit immeasurably by obtaining the equivalent of otherwise proscribed discovery.

■ Kanter has attempted to prove by the logic of elimination that this court is now in a better position to perceive the critical nature of Zell's testimony. But even if this court were to assume that the government's case is as constricted as Kanter contends, it is not self-evident that Zell is the only source of exculpatory evidence as to Kanter's conduct at the meeting. There were admittedly other witnesses at that meeting, and Kanter even asserts that there is evidence which would impeach these witnesses should they attempt to testify that Kanter acted in furtherance of the alleged conspiracy on that date. Kanter is free to call these witnesses, and to introduce this evidence, just as he is free to take the stand to testify to the nature of his activities. The court, therefore, can find no new circumstances which justify a conclusion different than that reached by Judge McGarr.

The motion of defendant Kanter for a severance is therefore denied, with leave to reassert the claim that a severance was necessary to obtain essential exculpatory testimony at a point following the presentation of evidence at trial.

*III. The Motion to Dismiss the Indictment*

This motion asserts three grounds for the dismissal of the indictment. First, it charges that the government has conceded that the defendants did not violate any provisions of the Internal Revenue Code or evade any taxes. The defendants argue

that this precludes the government from charging that they conspired to violate the tax laws.

Second, the defendants assert that the indictment is vague and ambiguous.

Third, the defendants assert that government prosecutor Joseph W. Salus, II, has acted with impropriety in connection with this case, and that the indictment must as a consequence be dismissed.

■ A. As discussed in the opinion of March 23rd, the instant indictment charges that the defendants devised a sophisticated scheme to enable their clients to file fraudulent tax returns. It is brought pursuant to 18 U.S.C. § 371 which proscribes conspiracies "to defraud the United States, or any agency thereof in any manner or for any purpose . . ."

The defendants maintain that the government has indicated in its response to their bill of particulars that the "tax consequences of this transaction are not a relevant issue and are not charged in the indictment". They also point out that the prosecution has at other times stated that the "indictment does not charge, nor are the allegations sufficient to prove, a conspiracy to evade tax".

The defendants therefore depict the prosecution as attempting to bring a conspiracy case where all of the defendants' overt acts were legal, and "where the tax consequences of those acts are totally inconsequential and innocent". They argue that a conspiracy indictment under § 371 should not be brought without allegations of a violation of a substantive provision of the tax code. In sum, they argue that this prosecution is actually directed at punishing these defendants for their highly effective but assertedly legitimate tax avoidance planning.

The government denies that it has ever conceded that the tax returns reflecting the transactions described in the indictment were not false. It states that its purported "admissions" merely reflected the fact that the indictment did not allege any additional

tax due and owing from the defendants' clients, an essential element of the crime of tax evasion.

The government points out that this indictment is directed at the defendants' efforts to manipulate various "entities, structures, and transactions" in a manner that would falsify the true tax consequences of the sale of the Arlington Towers and Arlington Plaza properties. It asserts that the indictment alleges that these manipulations included fraudulent backdating of documents, and the misstating of the value and actual sale price of certain properties.

The court finds that the defendants misconstrue both the statements of the prosecution and the nature of the indictment in arguing that the failure to bring a charge of tax evasion directed at the *clients'*[2] returns precludes a charge that the tax *attorneys* conspired to defraud the government.

■ B. The Federal Rules of Criminal Procedure require that a federal indictment contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." As indicated, the court has found that the indictment does state with clarity the essential nature of the facts underlying the indictment. The defendants have filed a bill of particulars, and the court has ordered government compliance thereto where it was appropriate. The indictment cannot be said to be insufficient.

C. The defendants have asserted in a variety of motions relating to this prosecution their contention that Joseph W. Salus, II, has acted with such impropriety in this case as to justify dismissal of the indictment. They contend that Salus has been "involved in every pivotal stage of the development and presentation of this case each time in a key review role in his capacity as attorney for the Internal Revenue Service and later as a member of the Department of Justice."

In particular the defendants stress that Salus participated in the initial investigation of this case, interviewing witnesses and evaluating testimony. They maintain that Salus subsequently was involved in each subsequent review of the decision to prosecute. The defendants assert that his participation in these varied roles, and his alleged overzealousness in pursuing the defendants, deprived them of due process. They argue that defendants in federal prosecutions are "entitled to a consideration of their case . . . in a manner that would provide the maximization of independent review and unbiased judgment and every possible opportunity for vindication."

The defendants further argue that Salus could not appear before the grand jury which was considering matters relating to the evidence developed by him while he was investigating this case for the I.R.S. They cite *U. S. v. Braniff Airways,* 428 F.Supp. 579 (W.D.Tex.1977), for the proposition that one who had developed and recommended a criminal prosecution at an agency administrative level is barred from appearing before the grand jury "as an observer or a prosecutor", and that the presence of such an unauthorized person in the jury room "is an independent ground sufficient to vitiate the indictment" (at 589).[3]

---

**2.** The government states that it will introduce evidence to prove that the defendants' clients did in fact file tax returns employing the schemes allegedly devised by the defendants and that these schemes of themselves would have resulted in tax deficiencies. Nonetheless, the government stresses that it is possible that the clients' tax returns might have proved not deficient as a result of other transactions, unrelated to defendants' alleged schemes. It further contends that the defendants' conspiracy was legally complete prior to the filing of any tax returns, and that they would be criminally liable regardless of whether their clients ultimately decided to follow their allegedly illegal advice.

**3.** The defendants' motion also alleges that the government failed to provide the grand jury with certain allegedly exculpatory evidence, and denied defendants the opportunity to provide similar evidence to the government prior to the indictment. In response, the government has indicated that it did deliver to the grand jury all the evidence that the defendants had requested to be transmitted. It also states that defendant Kanter waived the opportunity to appear at a conference with the IRS, but notes that the defendants did present information to the chief counsel' office via telephone,

The exact nature of Salus' participation in the development of the instant prosecution is a matter of extremely acerbic factual dispute between the parties. The court is of the opinion that this controversy is essentially another manifestation of defendants' overarching contention that the entire prosecution effort is tainted with wilful illegality and excessive prosecutorial zeal. As indicated, the court is prepared to inquire into the defendants' allegations that the indictment and evidence in this case have been irremediably contaminated by impermissible conduct at a full evidentiary hearing to be conducted in the context of the trial of this case. The allegations directed at the activities of the prosecutor may be aired at the same hearing.

*IV. Summary*

The pending motions in this case are disposed of as follows: The court holds that the defendants lack standing under the Fourth Amendment to assert the illegality of the searches relating to the "briefcase affair" or any other incident in which they lack the requisite interests stated in *Brown v. U. S.*, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). The court will consider the defendants' motion that the evidence in this case or the indictment itself be suppressed pursuant to judicial supervisory powers at a full evidentiary hearing to be held at an appropriate time following the presentation of evidence at trial of these defendants.

The motion of defendant Kanter for a severance is hereby ordered denied with leave to reassert the necessity of a severance following the presentation of evidence at the trial of these defendants.

The motion of the defendants to suppress the indictment for failure to allege a criminal violation under the laws of the United States, and for undue vagueness is hereby ordered denied.

The motion of the defendants to suppress the indictment because of prosecutorial misconduct will be considered at the same time as the defendants' motion to suppress pursuant to judicial supervisory powers.

In order to expedite the resolution of this case, in which the indictment was filed on March 4, 1976, the parties are ordered to appear in open court on Tuesday, May 24, 1977, at 10:00 o'clock A.M., to set this case for trial.

letter, and personal contact. It also asserts that these defendants did appear briefly at a later conference with the Department of Justice, on January 8, 1976. Finally, the defendants also refused the opportunity to appear before the grand jury without a guarantee of immunity. The defendants have not responded to this statement, and the court assumes that the government's statement of facts resolves this particular dispute.