**UNITED STATES of America, Appellee,**

v.

**David Carson JACKSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Margaret Frances McKENZIE, Appellant.**

Nos. 77–2530, 77–2531.

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1978.

Decided Oct. 5, 1978.

H. Duncan Garnett, Jr., Newport News, Va. (Jones, Blechman, Woltz & Kelly, Newport News, Va., on brief), for appellants.

Robert F. McDermott, Jr., Asst. U. S. Atty., Alexandria, Va. (William B. Cummings, U. S. Atty. and Leonie M. Brinkema, Asst. U. S. Atty., Alexandria, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, RUSSELL, Circuit Judge, and FIELD, Senior Circuit Judge.

DONALD RUSSELL, Circuit Judge:

The defendants are appealing their convictions under an indictment charging the conduct, operation and management of an illegal gambling business in violation of § 1955, 18 U.S.C.

We affirm.

The prosecution of the defendants grew out of an extended investigation by local, state and federal officers begun in August and continuing through the balance of 1976, of an alleged gambling operation centered at the Madison Avenue Confectionery, located at 4713 Madison Avenue in Newport News, Virginia, and at the Twenty-First Street News Stand in the same city. The newsstand had been operated in 1970 and 1971 by the defendant Jackson and, since 1972, by the defendant McKenzie. There is no statement of the ownership of the Con-

fectionery in the record but the defendant Jackson appears connected in some way with its operation. Both businesses were placed under surveillance in early September. Jackson was observed regularly between 9 and 11 o'clock in the morning going back and forth between the two establishments. The officers observed what appeared to be a "look-out" system set up at each location. The person identified as the "look-out" by the officers maintaining surveillance at the Confectionery would knock on the window whenever an officer appeared. At the newsstand, a person assumed by the officers to be a "look-out" would go inside whenever an officer approached.

An undercover agent testified to three occasions in late August and early September when he placed bets at the Confectionery. On September 24, 1976, a search warrant for the Confectionery was executed, presumably based on these statements by the undercover agent. The validity of the search warrant and its execution was not questioned. When the officers entered the Confectionery to execute the search warrant the defendant Jackson, who was present, immediately shouted towards the back of the Confectionery. "[h]ere they come, here they come." As a result of the search, several pieces of paper were found with number plays on them in the rear of the Confectionery. On the same day, a search warrant was executed for the newsstand. The defendant McKenzie was present and number slips were seized from a person on the premises. Subsequently on December 17, the officers raided the newsstand again and recovered two combination locks. These locks had a number face up and, according to the testimony at trial, these numbers corresponded to the "hit numbers" of that day.

■ Though they raise two other issues to which we refer later, the principal controversy in the case, however, involves the validity of the execution of a search warrant on a residence located at 636 Twenty-First Street, immediately adjacent to the newsstand, and the warrantless search of a room in a vacant house at 640 Twenty-First Street.[1] Both searches occurred on December 17, 1976. The officers had procured a search warrant for 636 Twenty-First Street. The validity of that search warrant was not questioned. When the officers went to 636 Twenty-First Street to execute the warrant, they knocked; receiving no response, they "announced then that [they] were police officers and * * * had a search warrant for the apartment and [they] then forced open the door." The defendant McKenzie and one Boyd were in the apartment. Between the two of them, the officers found numbers slips, which Boyd apparently attempted to hide, but which the officers seized. McKenzie was on the telephone. The Government, of course, contended that, based on these facts, the two were engaged in activity related to the gambling operation.

The warrantless search on the same day of a room in a vacant house at 640 Twenty-First Street resulted from the report of an officer who had seen Jackson, for whom other officers had a search warrant of his person, on Twenty-First Street. When he saw the officer, Jackson had run into a house located at 642 Twenty-First Street. This house was occupied by Mrs. Sally Pollard. The officer reported to the local Vice-Squad the suspicious movements of Jackson and his entrance into 642 Twenty-First Street. Other officers with a search warrant for Jackson's person, then went to 642 Twenty-First Street, told Mrs. Pollard that they had been advised that Jackson had

---

1. There was dispute in the testimony on the circumstances of the two searches. Much of it related to extraneous or peripheral matters. None of it arose out of the testimony of the defendants, since neither testified either at the suppression hearing or at trial. The District Court resolved these disputes in favor of the version as given by the officers. We are bound

by such resolution unless it can be found to be clearly erroneous. Since we find that the District Court's resolution was not only not clearly erroneous but entirely reasonable, we have adopted the facts as found by the District Court in determining the validity of the defendants' challenge to the two searches.

been observed entering her house and said that they had a search warrant for Jackson's person. Mrs. Pollard told them that Jackson was not in the house but added that they (the officers) could "come in and look" if they liked. As the officers were going into the house with Mrs. Pollard, they inquired whether Jackson had been there. Mrs. Pollard answered that Jackson had been there with a bag but she had told him "not to bring those numbers [presumably in the bag] into the house, she wanted nothing to do with them." Jackson, she said, then left her house and "placed the bag in the vacant house next door." Jackson returned, after putting the bag in the vacant house, and gave Mrs. Pollard a paper bag with two sets of keys in it. He told her to give the keys to Frances (meaning, as Mrs. Pollard understood it, the defendant McKenzie).

Mrs. Pollard told the officers during her conversation with them how they might look into the house where Jackson had put the bag containing the numbers by standing on a chair outside an open window at the house. The officers followed her direction. Two of them took turns standing on the chair and looking into the room. Plainly visible in the room was a bag similar to the one Mrs. Pollard had told Jackson not to bring into her house because she didn't want any "numbers" on her premises. Even though the bag was in plain view the officers did not attempt immediately to enter the house. They called the Commonwealth's attorney to inquire whether they should secure a search warrant before entering the room. They were advised that they did not need a search warrant and were told they could search the room. The officers followed this advice. Other than accumulated trash, the only article to be seen or found in the room was the bag. When opened with one of the keys from the

bag given the officers by Mrs. Pollard, numbers slips to the extent of $2,600.00 were taken from the bag and were seized by the officers.

The defendants contest the search at 636 Twenty-First Street on the ground that the search, though supported by a search warrant, was illegally executed. They would find the warrantless search of the room in the vacant house at 640 Twenty-First Street invalid because it was effected as a result of an illegal trespass. We find neither ground tenable.

In seeking to justify their argument for the suppression of the evidence secured through the warrantless search of 640 Twenty-First Street, the defendants begin by asserting their standing to contest such search. The grounds for standing, as stated by the two defendants, are somewhat different and we shall accordingly consider individually the two defendants' claims to standing. The defendant Jackson contends he acquired standing because of a "substantial proprietary or possessory interest [on his part] in the thing seized [i. e., the bag]" and because "mere possession of the bag recovered without warrant was itself an essential element of the crime charged both defendants." [2]

█ The claim by Jackson of standing on the ground that "mere possession" of the seized bag was itself an "essential element of the crime charged both defendants" may be quickly dismissed. Such possession was not an "essential element" of the crime of operating a gambling establishment. The other ground for standing asserted by Jackson (i. e., a "proprietary or possessory" interest in the thing seized) was effectively disposed of by Judge (now Justice) Stevens in *United States v. Lisk* (7th Cir. 1975), 522 F.2d 228, *cert. denied*, 423 U.S. 1078, 96

2. In effect, he claimed that he qualified for standing to contest the search on two of the three grounds [i. e., (b) and (c)] stated in the negative in *Brown v. United States* (1973), 411 U.S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 to constitute a basis for standing to contest a search and seizure, i. e., it denied standing to contest if the defendants "(a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure."

S.Ct. 865, 47 L.Ed.2d 89 (1976). In that case, the officers seized an illegal firearm as a result of a search of an automobile owned by one Hunt. The search of the automobile was conceded to have been illegal. It was stipulated, however, that, while he had no possessory or proprietary interest in the car searched, the defendant had "a proprietary interest" in the seized firearm. He urged that, because of such "proprietary interest" in the thing seized, he was "entitled to Fourth Amendment protection against its seizure." In disposing of this contention, Judge Stevens began by noting the "difference between a search and a seizure"; *i. e.,* "[a] search involves an invasion of privacy; a seizure is a taking of property."[3] He then proceeded to declare, quoting *Alderman v. United States* [394 U.S. 165, 171–2, 89 S.Ct. 961, 965, 22 L.Ed.2d 176] " 'that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.' " Applying that principle, the Court found that, while Hunt as the owner of the car searched was the "vic-

tim of the search" and had standing to contest the search in violation of his Fourth Amendment rights, the defendant who had neither a proprietary nor possessory interest in the car was not a "victim of the search" and had no standing to object to a search of the car. Accordingly, the "violation" [as represented by the illegal search of the car] was "clearly not available to the defendant as a basis for suppressing evidence acquired thereby * * *. In sum, defendant has standing [as the owner of the seized article] to object to the seizure, but no standing to object to the search."[4] Since the defendant was without standing to object to the search, "as far as defendant is concerned the case [was] the same as though the firearm had been found in plain view in a public place [where the defendant would have had no reasonable expectation of privacy]." The Court accordingly concluded that, under this reasoning, the seizure was "lawful" and "the evidence [was] admissible against defendant even though it could not be used against Hunt because it was found during a search which violated his Fourth Amendment rights."[5]

**3.** 522 F.2d at 230.

*See, also,* Gutterman, *"A Person Aggrieved": Standing to Suppress Illegally Seized Evidence in Transition,* 23 *Emory L.J.* 111 at 118 (1974):

"The decisions involving the principle that ownership or right to possession in the property seized is sufficient to establish standing have been hopelessly confused because of the courts' failure to distinguish between the defendant's interest in the property seized and his interest in the premises searched."

**4.** 522 F.2d at 230–231.

This same view was expressed by the Court in *United States v. Galante* (2d Cir. 1976), 547 F.2d 733, 739, n. 11, *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977):

"Two other bases for establishing standing have been suggested. The first is that mere 'possession' of the seized goods, without more, is enough. Even if it were sufficient, it would give standing to contest only the seizure, and not the search."

**5.** 522 F.2d at 230–231.

In *United States v. Potter* (N.D.Ill.1976), 419 F.Supp. 1151, 1156, *aff'd,* 567 F.2d 392, the Court, relying on *Lisk,* said:

"Nor can the defendants derive standing to object to the search because their property was seized by the government agents."·

This case, like the present one, arose in connection with a prosecution for conducting an illegal gambling business. The property seized in the search of the premises consisted of betting slips and worksheets. Only one of the defendants had any possessory interest in the premises searched. The other defendants had asserted standing to contest the search because they claimed an interest in the property seized. This is substantially the same position as that of the defendant in this case. *See, also, Meade v. Cox* (W.D.Va.1970), 310 F.Supp. 233, 236, *aff'd,* 438 F.2d 323, *cert. denied,* 404 U.S. 910, 92 S.Ct. 234, 30 L.Ed.2d 182 (1971). Any contention that this argument is supported by *United States v. Jeffers* (1951), 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 was dismissed by Judge Stevens in *Lisk* with the comment (522 F.2d at· 233, on Petition for Rehearing):

"we are persuaded that it is not a correct reading of the *Jeffers* opinion itself."

To the same effect is *United States v. Galante, supra* (547 F.2d 733); *cf.,* however, *United States v. Alewelt* (7th Cir. 1976), 532 F.2d 1165 at 1167, *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109.

**■** *Lisk* is consistent with a long line of cases involving searches of hotel or motel rooms. These cases recognized the shift made by *Katz*[6] in the rule for standing to contest a search from a proprietary interest in the premises searched to a reasonable expectation of privacy. Thus it is the present well-settled rule that a guest in a hotel or motel loses his reasonable expectation of privacy and consequently any standing to object to "an unauthorized search of the premises" after his rental period has terminated. And this is true even though he may have left property in the hotel room. *United States v. Parizo* (2d Cir. 1975), 514 F.2d 52, 54–55; *United States v. Akin* (7th Cir. 1977), 562 F.2d 459, 463, *cert. denied*, 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978); *United States v. Croft* (10th Cir. 1970), 429 F.2d 884, 887; *Granza v. United States* (5th Cir. 1967), 377 F.2d 746, 748–749; *D'Argento v. United States* (9th Cir. 1965), 353 F.2d 327, 344, *cert. denied*, 384 U.S. 963, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966). It is also analogous to the situation in which an "individual places his effects upon premises where he has no legitimate expectation of privacy (for example, in an abandoned shack or as a trespasser upon another's property)"; in such a case "he has no legitimate reasonable expectation that they will remain undisturbed upon these premises" and consequently has no standing or right to contest a search.[7] Accordingly, when Jackson in this case placed the bag in an empty room n the vacant house in which he had concededly neither a proprietary nor a possessory interest, he had no more expectation of privacy than if he had placed the bag "in plain view in a public place," to use *Lisk's* phrase,[8] and thus had no basis for objecting to the seizure. *See, United States v. Galante, supra*, at 739, n. 11 (547 F.2d).[9] And this fact, apart from

---

**6.** *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576.

**7.** Gutterman, *"A Person Aggrieved": Standing to Suppress Illegally Seized Evidence in Transition*, 23 *Emory L.J.* at 119; *State v. Pokini* (1961), 45 Hawaii 295, 315, 367 P.2d 499, 509.

This conclusion is also implicit in the Court's statement in *Jones v. United States* (1960), 362 U.S. 257 at 267, 80 S.Ct. 725 at 734, 4 L.Ed.2d 697:

"No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. *This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched.*" (Italics added)

This same idea was stated in White & Greenspan, *Standing to Object to Search and Seizure*, 118 *U.Pa.L.Rev.* 333, 346–347 (1970):

"Under present tests for determining standing, the defendant must have been a 'victim' of the illegal search, in the sense that he suffered an invasion of privacy, before he will be afforded standing to exclude the illegally obtained evidence."

**8.** 522 F.2d at 230.

**9.** Jackson has made no claim to standing as the one against whom the search was directed. There is language in *Jones*, 362 U.S. at 261, 80 S.Ct. 725 and *United States v. Jeffers*, 342 U.S.

at 51, 52, 72 S.Ct. 93, which might suggest that this (*i. e.*, person against whom search is directed) is a separate and independent ground for standing. There are a number of cases, including our own case of *United States v. Cobb* (4th Cir. 1970), 432 F.2d 716, 719–720, in which this language has been cited in finding standing. But, as the Court remarked in *United States v. Baskes* (N.D.Ill.1977), 433 F.Supp. 799, 803, "[i]n those cases where the defendants were found to be the objects of the search, and where standing was granted, there also appears to be a more traditional alternative basis for standing." This is certainly true of *Cobb*, where "object of the search" was bracketed with conceded "possession of the vehicle to be searched" in a prosecution for possession. In *United States v. Potter, supra* (419 F.Supp. 1151), *United States v. Baskes, supra* (433 F.Supp. 799) and *United States v. Payner* (N.D. Ohio 1977), 434 F.Supp. 113 at 126, n. 61, appeal dismissed for want of jurisdiction 572 F.2d 144 (1978), all conclude that as Judge Stevens suggested that *Jones* might be read, that "target of the search" does not represent an independent ground for standing and that the words in *Jones* of "(1) 'a victim of a search' and (2) 'one against whom the search was directed' may be read as apposite." *See, also, United States v. Galante, supra* (547 F.2d 733). And this seems justified in the light of the majority opinion in *Alderman v. United States* (1969), 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, which apparently refused to accept Justice Fortas' argument in favor of such basis for standing as set forth in his dissenting opinion, 394 U.S. at 208, 89 S.Ct. 961, and of *Brown*, 411

any question of standing on his part, would be dispositive of any right by him to suppress the fruit of the searches on the merits. *United States v. Alewelt, supra* (532 F.2d at 1168).[10]

The standing of the defendant McKenzie to contest the search may appear at first blush more reasonable than that of her co-defendant. She, of course, had not rented the house but the owner had given her a key and had given her permission to store some furniture in the house. So far as the record shows, however, the only article of furniture she had stored in the house was a stove. Specifically, she had stored nothing in the single room which the officers entered and from which they removed the contested bag. There is no suggestion in the testimony that she ever knew that Jackson had placed the bag in the room or that she had authorized him to put the bag in the room. In fact, it would seem that Jackson had impulsively placed the bag in that room only because Mrs. Pollard refused to permit him to bring the bag into her house. It is difficult to find in this situation any reasonable expectation of privacy of McKenzie which was invaded by the officers through their search of this single room in the vacant house. *See, United States v. Abbarno* (W.D.N.Y.1972), 342 F.Supp. 599, 604.

■ But, even if McKenzie should be considered as having standing, her attack on the search must fail. This is so because the search was valid. The basic ground for invalidity of the search, as pressed by the defendants, is that the officers had to commit a trespass in order to look into the windows of the room and observe where Jackson had placed the bag. The decision of the Supreme Court in *Katz v. United States, supra* 389 U.S. at 351–352, 88 S.Ct.

507, seems clear to the point that the prohibition in the [Fourth] Amendment is against unreasonable searches and seizures, not trespasses, *per se*. A trespass is only relevant in this context if it represents an invasion of a defendant's reasonable expectancy of privacy. This point was emphasized by Judge Leventhal recently in his concurring opinion in *United States v. Johnson* (1977), 182 U.S.App.D.C. 383, 396, 561 F.2d 832, 845: "The salient question is, was the trespasser in a place where he was encroaching on a reasonable expectation of privacy that comes within the fair intendment of the Fourth Amendment." Because the Court concluded there was not such an expectation in that case, the Court sustained the search even though effected by a trespass. This is in accord with the language of Judge Wisdom in *United States v. Polk* (5th Cir. 1970), 433 F.2d 644, 647, n. 1, and the holdings in *United States v. Alewelt, supra* (532 F.2d at 1168); *United States v. Conner* (7th Cir. 1973), 478 F.2d 1320, 1323; *United States v. Hanahan* (7th Cir. 1971), 422 F.2d 649, 652–654; *People v. Terry* (1969), 70 Cal.2d 410, 77 Cal.Rptr. 460, 454 P.2d 36, 48, and *People v. Krivda* (1971), 5 Cal.3d 357, 96 Cal.Rptr. 62, 486 P.2d 1262, 1267. In *Polk*, the Court said:

"The rationale that reasonable expectations of privacy rather than property rights are the interests protected by the fourth amendment should be allowed its full scope. A technical trespass should not necessarily be deemed a fourth amendment search when no expectations of privacy are disappointed."

In *People v. Krivda*, the Court said:

"The fact that a search may or may not involve a trespass or other invasion of defendant's property interests is not conclusive, for 'The prohibition in the

U.S. 223, 93 S.Ct. 1565, in which Chief Justice Burger, in listing the several possible grounds for standing, omitted "object of the search" as one of such grounds. We conclude that, even had the contention been advanced, it would, standing alone, provide no basis for standing. Neither would it be possible to claim standing if it were found that his co-defendant had standing. *United States v. Tortonello* (2d Cir.

1976), 533 F.2d 809, 814, n. 5, *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177; *United States v. Hunt* (5th Cir. 1974), 505 F.2d 931, 939, *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975).

**10.** This case expresses some differences with *Lisk* on standing but it arrives at the same result as *Lisk* on the merits.

**660**

[Fourth] amendment is against unreasonable searches and seizures, not trespasses.' "

In *Atwell v. United States* (5th Cir. 1969), 414 F.2d 136, 138, the Court said:

"Moreover, even if the officers were trespassing on private property, a trespass does not of itself constitute an illegal search."

■ Of course, a search of one's home or its curtilage, effected as a result of a trespass, is an encroachment on a person's expectancy of privacy and is for that reason, but not because of the trespass, a violation of the Fourth Amendment if not based on probable cause or authorized by a search warrant. In this case, *the search was not of the home of either Jackson or McKenzie* but of an unoccupied house, placarded as "For Rent." Premises noticed for rent are generally considered open to public view by anyone who might be interested.[11] It would be expected that persons so interested would inspect the house, look in the windows and view the surrounding premises in order to determine what interest they might have in renting. To do so they would naturally intrude upon the lot about the house. And with an open window, with a chair conveniently propped up under it, there was in effect an invitation for public inspection particularly of the room with the open window. In effect, the open area about a vacant house and lot, placarded with "For Rent" signs, has no legal similarity to the curtilage around an occupied dwelling. *United States v. Potts* (6th Cir.

1961), 297 F.2d 68, 69, or to an "unlawful invasion" of one's dwelling, *United States v. Young* (4th Cir. 1963), 322 F.2d 443, 445, *cert. denied sub nom., O'Neal v. United States*, 375 U.S. 952, 84 S.Ct. 443, 11 L.Ed.2d 313. McKenzie had no reasonable expectation of privacy in the vacant, open areas about the vacant house and without such an expectancy she had neither standing nor a right to complain of any intrusion upon the vacant lot by the officers, particularly as it concerned an article not placed in the house by her or with her knowledge or authority.[12] Further, the action of the officers in going on the lot about the vacant house was perfectly reasonable. They had been told by Mrs. Pollard that she had seen Jackson with a bag with numbers slips and that she had seen him throw it through the open window into the vacant house. The officers had a right under those circumstances to go on the lot on which the vacant house was located and to stand on the chair in order to look through the open window into the room where Mrs. Pollard told them Jackson had thrown the bag.[13] The Fourth Amendment only protects against unreasonable actions of the police officers.[14] The action of the officers up to this point, manifestly did not represent any unreasonable encroachment upon any reasonable expectation of privacy by either McKenzie or Jackson. It did not therefore constitute any violation of the Fourth Amendment. *See, United States v. Abbarno, supra* (342 F.Supp. at 604). When, as a result of that justified look through the window, the officers observed in plain view the incrimina-

---

**11.** *Cf., Ponce v. Craven* (9th Cir. 1969), 409 F.2d 621, 624–625.

**12.** *Katz v. United States, supra,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring); *United States v. Hunt, supra* (505 F.2d at 937 and 941) the Court said:

"There may be a cognizable Fourth Amendment interest in the absence of a traditional property right, but it is almost certainly true that property rights cannot support a Fourth Amendment claim in the absence of a reasonable expectation of privacy in the property involved. * * *

"* * * the constitutional right of protection against unreasonable searches and seizures attaches only when an individual's rea-

sonable expectation of privacy is shattered by illegal Governmental intrusion."

*See, also, Ponce v. Craven, supra* (409 F.2d at 624–625); *United States v. Abbarno, supra* (342 F.Supp. at 604).

**13.** *See, United States v. Johnson, supra* (561 F.2d at 840–841).

**14.** *See,* Amsterdam, *Search, Seizure, and Section 2255: A Comment,* 112 *U.Pa.L.Rev.* 378, 388 (1964):

"[The exclusionary] rule [in enforcement of the Fourth Amendment] is a needed, but [sic] grudgingly taken, medicament; no more should be swallowed than is needed to combat the disease * * *."

ting evidence, corroborative of the information given them by Mrs. Pollard, their subsequent warrantless search of the room and seizure of the incriminating bag were within the reasonable limits allowed under the Fourth Amendment. *Coolidge v. New Hampshire* (1971), 403 U.S. 443, at 465–466, 91 S.Ct. 2022, 29 L.Ed.2d 564, *reh. denied,* 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120; *Harris v. United States* (1968), 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067.

▪ The additional point that the officers acted without securing a search warrant is without merit. In *United States v. Johnson, supra* (561 F.2d 832), the Court was confronted with the same contention. Like the officers here, the officers in that case, after observing through a window the evidence of crime in the house, consulted their superiors who in turn sought the advice of an Assistant United States Attorney who advised them that under the circumstances they could proceed without a search warrant. They acted only after receiving such advice and that was precisely what the officers in this case did. The Court declared in that case that this action of the officers did "not seem to us to have been unreasonable" and concluded that, while "[t]he prosecutor's advice in this instance is not, of course, conclusive," it is "relevant to the question of whether the decision by the police to proceed without a warrant was reasonable. The trial judge so regarded it in making his ruling, and we think he was well within the bounds of his discretion in doing so." [15] That language is equally applicable to this case and disposes of the contention of the defendants that the search of 640 Twenty-First Street was invalid for failure of the officers to secure a search warrant.

The second search by the officers was of 636 Twenty-First Street, which was contested not for any invalidity of the search warrant, under the authority of which the officers acted, but for impropriety in the manner of executing the search warrant. The alleged impropriety was the failure to observe the requirements of § 3109, 18 U.S.C. by delaying sufficiently between their knock and the actual intrusion by the officers into the house. There is, however no credible evidence establishing how long the officers did delay after knocking before they pushed their way into the house. A witness for the defendants at the suppression hearing, Workman, testified that the officers did not even knock before "crashing" into the house. The District Court gave no credence to Workman's testimony, however, and we find no reversible error in its failure to accord any weight to his testimony.[16] The evidence indicates rather strongly that Workman was one of the "look-outs" for the defendants and was engaged with them in their illegal activity. The officers themselves, on whose testimony both the defendants and the Government rely in this connection, stated that they knocked, identified themselves and their purpose, and "*then* forced the door open." (Italics added) Whether "then" meant simultaneously or whether it was intended to suggest some interval of time was not developed in the record. The defendants urge that "then" should be construed as meaning "immediately" or "simultaneously." We, however, find the term ambiguous. "Then," when used as it was here as an adverb of time, is not a precise term and has been variously defined merely as "subsequent in time," or "immediately," or "soon afterwards;" ordinarily, however, it "denotes nothing more than an order of sequence." *See,* 86 C.J.S. Then at 770–771; *Winand v. Case* (D.Md.1957), 154 F. Supp. 529, 536; *Williams v. Taylor* (1931), 276 Mass. 349, 177 N.E. 553, 556. It is thus not clear from the record what interval of time elapsed between the knock and the intrusion nor does § 3109 for that matter

---

15. 561 F.2d at 843.

16. There is some question in the record whether Workman was actually in a position where he could have observed the action of the officers in effecting their entry into the residence to be searched or to have heard what was said by the officers at the time. This, no doubt, was an additional fact considered by the District Court in its determination not to credit Workman's testimony.

fix any inflexible or precise rule with respect to the time an officer must wait before using force to enter a house under a valid search warrant.[17] Moreover, the Government asserts that it is immaterial what time interval there may have been between the knock and the intrusion, since there were "exigent circumstances" which would have justified an "immediate" intrusion.

 It is the rule that the time which must elapse after knocking and announcing their identity and purpose by the searching officers before breaking and entering varies with the exigencies of each case. *United States v. Phelps* (9th Cir. 1974), 490 F.2d 644, 647, *cert. denied,* 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63. In one case a delay of 10 seconds was found reasonable, *United States v. Allende* (9th Cir. 1973), 486 F.2d 1351, 1353, *cert. denied sub nom., Montoya v. United States,* 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974); in another a delay of 30 seconds before entry was found permissible, *United States v. West* (2d Cir. 1964), 328 F.2d 16, 18; in another a delay of a minute was held to be reasonable, *Martin v. United States* (5th Cir. 1965), 341 F.2d 576, and in still others, it has been found that the entry was permissible even simultaneously with or immediately after announcement if there is a likelihood that the occupants will attempt to escape, resist or destroy evidence, *United States v. Busta-mante-Gamez* (9th Cir. 1973), 488 F.2d 4, 12, *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). Under the facts of this case, we are unable to find that the District Court committed error in finding that the defendants had not satisfied their burden of establishing a *prima facie* violation of § 3109. *United States v. Gardner* (5th Cir. 1977), 553 F.2d 946, 949, *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978). On the other hand, the evidence of exigent circumstances as presented by the Government was sufficient to satisfy the Government's burden of establishing a right to simultaneous entry if it were to be concluded that the term "then," as used by the officers, was to be construed as "immedi-

ately" or "simultaneously." What the officers were seeking by their search was the numbers slips, which were susceptible of easy destruction. Under those "exigent circumstances" "simultaneous" entry was permissible. We accordingly find no error in the District Court's ruling denying suppression.

By a second ground of appeal, the defendants complain of the refusal of the District Court to order a mistrial on account of an answer given by the witness Pollard during her cross-examination by counsel for the defendants. Though called at trial as a witness by the Government, Mrs. Pollard was not unfriendly to the defendants. She had earlier testified as a witness for the defendants at their suppression hearing. During that testimony she had declared herself a friend of the defendants particularly of Jackson for whom she had formerly cooked. It was also brought out during the direct examination of Mrs. Pollard by counsel for the defendants at this suppression hearing that such counsel had talked to her on two occasions before counsel called her as a witness. Both during her direct examination and cross-examination, counsel for the Government and counsel for the defendants established by Mrs. Pollard that the defendant Jackson was the individual who gave her the paper bag with the keys in it with instructions to give the bag "to Frances." Thus she answered counsel for the defendants' question, "[w]ho gave you those keys on December 17?", with the positive statement, "David Jackson."

 At the trial itself, Mrs. Pollard, called as a Government witness, testified on direct examination again that the defendant Jackson had given her the bag with the keys in it, one of which keys was later used to open the bag seized by the officers as a result of the search of a room at the house on 640 Twenty-First Street. For some reason, counsel for the defendants sought in his cross-examination to have Mrs. Pollard admit that, in one of her conversations with him (both of which occurred before the

---

**17.** *See Katz v. United States, supra* (389 U.S. at 356, n. 16, 88 S.Ct. 507).

suppression hearing), she had said she "had been drinking that day" and did not know whether it was Jackson or his companion who had given her the bag with the keys. When she apparently denied this, he then asked her if she had not told him that one of the officers had told her that if she "changed [her] story at all he would convict her" (referring, it is to be assumed, to her testimony that Jackson had given her the bag). She denied any such statement. Counsel persisted in pressing her to admit she had made such statement. When counsel repeated the question, Mrs. Pollard stated:

"You said to me, 'You won't get time for it,' and I told you I wasn't going to do that because I wasn't going over there and lie."

It was that latter statement, blurted out after counsel had sought to suggest by his question that the witness had previously told him that she had been coerced by the threats from the officer in continuing to identify the defendant Jackson as the person who had given her the bag with the keys. In view of the persistence of counsel's questioning about her conversations with him and the implication that she was testifying falsely because of fear of retaliation by the officers, it could be argued that counsel in a way may have invited the reply. *See, United States v. Pentado* (5th Cir. 1972), 463 F.2d 355, 361–362, *cert. denied sub nom., Ochoa v. United States*, 409 U.S. 1079, 93 S.Ct. 698, 34 L.Ed.2d 668. Even if it be assumed, however, that the answer was not at all responsive and was improper, nonetheless it does not follow that a mistrial was demanded. The test to be applied in such a situation is whether the improper evidence volunteered by a witness, "when considered in conjunction with the cautionary instructions given by the district judge, so prejudiced the jury against [the defendant] that the declaration of a mistrial was required." *United States v. Hall* (4th Cir. 1965), 342 F.2d 849, 854, *cert. denied,* 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60; *White v. United States* (4th Cir. 1960), 279 F.2d 740, 749–750, *cert. denied,* 364 U.S. 850, 81 S.Ct. 96, 5 L.Ed.2d 74.

And this determination is ordinarily committed to the sound discretion of the trial judge, *United States v. Norris* (4th Cir. 1963), 325 F.2d 209, 210, which is only to be reversed if clearly erroneous, *United States v. Wade* (8th Cir. 1972), 467 F.2d 1226, 1229, *cert. denied sub nom., Houston v. United States,* 410 U.S. 933, 93 S.Ct. 1384, 35 L.Ed.2d 596. The reason for such rule was stated in *Schaefer v. United States* (8th Cir. 1959), 265 F.2d 750, 753, *cert. denied,* 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82:

"A trial judge is always in the best position to determine whether such an incident as occurred in this case, which it was impossible to anticipate or guard against (compare, *Cochran v. United States,* 8 Cir., 41 F.2d 193, 206, and *Reistroffer v. United States,* 8 Cir., 258 F.2d 379, 392–393), calls for a mistrial. Only a clear and obvious abuse of a trial court's discretion in refusing a mistrial will justify a reversal of a case by an appellate court upon a cold record. As was said in *Goldstein v. United States,* 8 Cir., 63 F.2d 609, 613, 'It is impossible to gather from the cold record * * * the atmosphere of the trial itself, the manner in which the words were spoken, or the probable effect, if any, which they had upon the merits of the controversy.' . . ."

In our opinion, the District Court did not abuse its discretion in denying the motion for a mistrial in view of its cautionary instructions given at the time and repeated later in its general jury instructions, under the circumstances of the case. And such a ruling conforms with the result reached in other cases involving largely like circumstances. Thus, in *United States v. Faulkenbery* (9th Cir. 1973), 472 F.2d 879, 882, *cert. denied,* 411 U.S. 970, 93 S.Ct. 2161, 36 L.Ed.2d 692, counsel for the defendant had interviewed prior to trial a witness called by the Government. In cross-examination of the witness by defendant's counsel, the witness blurted out that in the interview "the defense attorney had lied to her." Defendant's counsel moved for a mistrial. The trial judge refused the motion but gave prompt cautionary instructions. On appeal

that ruling was found not to be an abuse of discretion and the conviction was sustained. *United States v. Agueci* (2d Cir. 1962), 310 F.2d 817, 836–838, *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963), is likewise similar factually to this case. In that case, the prosecutor insinuated during his summation "that the lawyer representing [the defendants] had been instrumental in suborning their false testimony." Counsel for the defendant did not request any corrective instruction for this concededly "irregular and improper" remark of the prosecutor nor did the trial judge give one. The Court was "agreed that had a proper corrective charge been given, counsel would have no cause to complain here." Despite the absence of a corrective charge, the Court concluded that, even though "the prosecutor's remarks were improper, we do not think they were, so prejudicial as to require a new trial." Unlike the Court in *Agueci*, and similar to the actions of the Court in *Faulkenbery*, the District Court did in this case give prompt cautionary instructions. In consideration of all the circumstances, including the possible prejudice to the defendants and its eradication if there was any prejudice, by the trial court's cautionary instructions, we find no error in the District Court's denial of a mistrial.

Finally, the defendants complain of the admission in evidence of a conversation between an officer and the defendant Jackson in 1975 prior to the time covered in the indictment. However, the District Court, in admitting such evidence, very strictly limited it by cautionary instructions, given both at the time such evidence was admitted and later in its general instructions. In the light of these limiting instructions, we find no prejudicial error in the admission of such evidence.

The convictions of David Carson Jackson and Margaret Frances McKenzie are accordingly

*AFFIRMED.*