995 F.2d 1064
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
William Columbus SMITH, a/k/a Smitty, Defendant-Appellant.
 No. 92-5608.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 31, 1993
Decided: June 7, 1993
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Richard B. Kellam, Senior District Judge. (CR-92-46-N)
 Argued: Joseph Barry McCracken, Cook & McCracken, Norfolk, Virginia, for Appellant.
 Kevin Michael Comstock, Assistant United States Attorney, Norfolk, Virginia, for Appellee.
 On Brief: Richard Cullen, United States Attorney, Peter A. Dutton, Third Year Law Student, Norfolk, Virginia, for Appellee.
 Before NIEMEYER, Circuit Judge, SPROUSE, Senior Circuit Judge, and FABER, United States District Judge for the Southern District of West Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 William Columbus Smith appeals from jury convictions on one conspiracy count and six substantive counts involving violations of drug laws. He raises a Fourth Amendment issue and a host of contentions implicating alleged pretrial and trial errors. We affirm.
 
 
 2
 Viewed in the light most favorable to the government, the trial evidence established that Smith, a resident of Chesapeake, Virginia, travelled several times between mid-1991 and March 1992 to New York City with large quantities of money and returned with large quantities of cocaine for distribution in Chesapeake and Portsmouth, Virginia. The initial investigation into Smith's drug activities began after Angela Laramay, with whom Smith had exchanged cocaine for sex, became an informant for the Chesapeake Police Department. At trial Laramay and Thomas Beauregard, Smith's middleman distributor, testified for the government that one of them usually accompanied Smith on his trips to New York.
 
 
 3
 In August 1991, on the basis of information supplied by Laramay as a confidential informant, police officers obtained a search warrant of Smith's Chesapeake residence. In executing the warrant, they observed that the front door of Smith's residence was open, and that only the storm door was closed. They saw Smith sitting in the living room. The lead detective knocked on the storm door, announced "Police, search warrant" and, after a few seconds, entered the house and executed the warrant. The officers found approximately 23 grams of cocaine, approximately 343 grams of cocaine base (crack), scales, cutting agents, other drug paraphernalia, a large amount of currency, and two shotguns. Smith was arrested but he posted bond for his release from custody pending trial.
 
 
 4
 While Smith was out on bond, he continued to travel to New York City to buy drugs for distribution in Virginia. As a result, the federal Drug Enforcement Agency ("DEA") began to investigate him. Laramay put a DEA Task Force Agent in touch with Beauregard. Beauregard sold both cocaine and crack to the undercover agent on several occasions in January through March of 1992. Although at first reluctant to reveal his source, Beauregard finally indicated that it was the defendant Smith. Eventually, Smith and Beauregard met with the undercover agent to arrange for Smith to provide the agent with three kilograms of cocaine. At this meeting, Smith acknowledged his participation in at least one previous sale and discussed the purity level of cocaine and how the money for the purchase of the cocaine would be handled. He also discussed coordination of the cocaine payment and delivery. At trial, Beauregard's testimony of these events was supported by a tape recording made of the conversation. The government also presented cash receipts and registration cards from a New York City hotel and telephone records indicating that the defendant had made calls to convicted Colombian drug dealers Maria and Omar Grajales.
 
 
 5
 Smith's meeting with Beauregard and the undercover agent occurred on March 9, 1992. Later that same day, DEA agents and city police officers arrested Smith and Beauregard and executed search warrants on Beauregard's place of business. Records confiscated there linked Smith not only to his residence in Chesapeake but to a residence in Franklin, Virginia, which turned out to be that of his brother. A search warrant was executed that evening on his brother's residence, revealing drug packaging paraphernalia.
 
 
 6
 Smith was indicted on nine counts charging him with conspiring to distribute narcotics in violation of 21 U.S.C. § 846 (Count 1), possessing with intent to distribute narcotics in violation of 21 U.S.C. § 841(a)(1) (Counts 2 and 3), and causing the distribution of narcotics in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 4 through 9). After the court denied Smith's motion to suppress some of the evidence obtained during the searches, the case was presented to a jury. Smith was acquitted on Counts 4 and 5 but convicted on the remaining counts; his conviction on Count 1 was based on the theory that he had participated in a single conspiracy. After a hearing, he was sentenced as a career offender to 360 months' confinement and ten years of supervised release.
 
 
 7
 On appeal, Smith contends that the trial court erroneously (1) refused to suppress the evidence of the August 1991 search as violative of the Fourth Amendment, (2) refused to require the government to provide Laramay's address, (3) refused to require the government to provide a bill of particulars naming identified but unindicted co-conspirators, (4) admitted certain prejudicial evidence, (5) overruled his objection to the government's preemptory strikes as racially motivated, and (6) instructed the jury on the conspiracy count. We consider the arguments in turn.
 
 
 8
 Smith does not contest the validity of the search warrant but the manner in which it was executed: he contends that the police failed to knock and announce their presence before entering his home. Whether a failure to knock and announce constitutes a violation of the Fourth Amendment depends on the circumstances and is measured under a standard of reasonableness. Mensh v. Dyer, 956 F.2d 36, 40 (4th Cir. 1991). Viewed with the appropriate deference to the government's evidence, the trial proof showed that the lead detective knocked, announced his purpose and presence in a loud voice, and after a few seconds entered and detained the defendant in his living room before conducting the search of the entire house. Because the government established that the defendant was known to possess weapons, we are persuaded that the short delay between the knock and the entry was reasonable. See Simons v. Montgomery County Police Officers, 762 F.2d 30, 32 n.1 (4th Cir. 1985), cert. denied, 474 U.S. 1054 (1986); United States v. Jackson, 585 F.2d 653, 662 (4th Cir. 1978).
 
 
 9
 The next issue requiring our attention is Smith's assertion that the government should have provided him with Laramay's address before trial. Early in the pretrial stages, Laramay contacted defense counsel and agreed to an interview. The next day, however, she entered the witness protection program and advised government agents that out of fear for her safety she did not want Smith or his associates to know her whereabouts. Defense counsel knew that Laramay would be a government witness and knew the substance of her potential testimony. The government disclosed to the defense all relevant information about her, including her criminal record and her arrangement with the DEA and the Chesapeake police. At the hearing on Smith's motion for disclosure of her address, Smith stipulated that Laramay had a genuine concern for her safety. He also stipulated that the prosecutor had relayed all of defense counsel's requests to speak with her, and that she was free to contact him if she so chose. Additionally, the court offered the defense the opportunity to examine the DEA agent who had worked most closely with Laramay, but Smith declined the offer. Finally, Laramay was available for cross-examination when she testified for the prosecution at trial. The court's refusal to require the government to provide Laramay's address, under these circumstances, was not error. See United States v. Smith, 780 F.2d 1102, 1107-10 (4th Cir. 1985).
 
 
 10
 Nor do we think the trial court abused its discretion in denying the defendant's motion for a bill of particulars containing the names of identified, unindicted co-conspirators-specifically, Maria and Omar Grajales. A bill of particulars, of course, should be granted when it is necessary to provide sufficient information to a defendant of the charge against him, allowing him to prepare for trial and minimizing the dangers of surprise. United States v. Schembari, 484 F.2d 931, 934-35 (4th Cir. 1973). Here the court, although finding that the indictment apprised Smith of the charges against him, advised the government to provide him with "whatever evidence" it had regarding the names of known co-conspirators. The government and defense counsel disagree over whether the government complied with the court order. It appears, however, that the defense essentially had this information. It was aware of the identity of the Grajaleses, and providing their names would have been no more than a formality. In any event, this objection was not raised during trial, and the government's alleged noncompliance with the court's order does not rise to the level of plain error. See United States v. Olano, 61 U.S.L.W. 4421, 4424 (U.S. Apr. 26, 1993); Fed. R. Crim. P. 52(b).
 
 
 11
 Smith further argues that he was prejudiced by the admission of evidence of (1) weapons located at his residence; (2) his brother's prior narcotics conviction; (3) Maria and Omar Grajales' prior convictions, as well as the reference to Colombia as their country of origin; and (4) Smith's conviction and incarceration for five years for an unrelated crime. He contends that all this evidence was irrelevant under Rule 401 of the Federal Rules of Evidence, and, even if relevant, that it should have been excluded under Rule 403 because of its undue prejudice. Although Smith was not charged with using a firearm in connection with his drug activities, precedent makes clear that such evidence is permissible. Where it is established that a defendant is distributing narcotics, the jury may infer that firearms located at distribution points were used to facilitate the illegal business. See, e.g., United States v. LaGuardia, 774 F.2d 317, 320 (8th Cir. 1985). The government offered the next item of disputed evidence, the incarceration of Smith's brother, to establish that the brother was not in possession of the Franklin residence. Through evidence of Smith's ties to the house, the government used the brother's absence to show that the drug paraphernalia found there belonged to the defendant. While the evidence may have presented a close Rule 403 question, the district court did not, in our view, abuse its discretion in ruling in favor of its admission. Likewise, the admission of evidence concerning the Grajales' convictions was within the trial court's discretion as relevant to show that Smith was dealing with known drug dealers in New York. The identification of their nationality as Colombian, however, was, in our view, unfair and an example of unnecessary prosecution "overkill" since it was already established that they were drug dealers. However, since there was overwhelming evidence that Smith was involved in drug dealing, the error was harmless. See United States v. Jones, 913 F.2d 174, 177 (4th Cir. 1990), cert. denied, 111 S. Ct. 766 (1991). For similar reasons, we find no reversible error in the admission of evidence concerning Smith's previous incarceration.
 
 
 12
 Likewise, Smith, who is black, has failed to show that the government's preemptory strikes violated his equal protection rights by being racially motivated. See Batson v. Kentucky, 476 U.S. 79, 96 (1986). Of the thirty-seven venire members, twelve were black. The government, exercising only five of its six preemptory strikes, eliminated three black and two white members. After Smith objected, the government offered nondiscriminatory reasons for the preemptory challenges. The selected jury included seven black members, four whites, and one Asian. It cannot be inferred from these circumstances that the government's use of its preemptive challenges was racially motivated. Finally, Smith's attack on the trial court's conspiracy instructions also fails. Viewing the instructions as a whole, we are easily persuaded that the jury could understand the differences between a multiple conspiracy theory and the single conspiracy theory under which Smith was convicted.
 
 
 13
 In view of the above, the judgment of the district court is affirmed.
 
 AFFIRMED